# IN THE COURT OF APPEALS OF IOWA

No. 14-0817
Filed March 25, 2015

**REILLY CONSTRUCTION CO., INC.,**
        Plaintiff-Appellee/Cross-Appellant,

**vs.**

**BACHELDER, INC.,**
        Defendant-Appellant/Cross-Appellee.
_____

        Appeal from the Iowa District Court for Winneshiek County, John J.

Bauercamper, Judge.


        A property owner appeals the district court's determination his oral

contract with a construction company to build a pond did not carry express or

implied warranties.  The construction company cross-appeals the court's refusal

to foreclose its mechanic's lien.  **REVERSED AND REMANDED ON APPEAL;**

**AFFIRMED ON CROSS-APPEAL.**


        Dale L. Putnam of Putnam Law Office, Decorah, for appellant.

        Richard D. Zahasky, Decorah, and Douglas A. Boese and John C. Beatty

of Dunlap & Seeger, P.A., Rochester, Minnesota, for appellee.


        Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, J.**

This appeal concerns a pond that does not hold water. At issue is how the landowner and the builder apportioned that risk in their oral contract for the project. The landowner, Bachelder, Inc., paid for the initial dam construction but not for remedial digging. The builder, Reilly Construction Co., Inc., filed a mechanic's lien. The district court declined to foreclose the mechanic's lien but also rejected Bachelder's counterclaims for breach of either express or implied warranties. Both sides appeal. Because the district court erred in finding no breach of an express warranty the pond would hold water or an implied warranty of workmanlike construction or fitness for a particular purpose, we reverse and remand for a hearing on Bachelder's damages. Finding no implied contract to perform additional work on the pond, we affirm on Reilly's cross-appeal.

## I.    Background Facts and Proceedings

Leon and Sherry Bachelder wanted to add a recreational pond to their Winneshiek County acreage.[1] They hoped to use it with family and friends to "swim, fish, and take the boat out on it." As part-owner of the Decorah Auto Center, Leon Bachelder had sold pickup trucks to Christopher Reilly, owner of Reilly Construction Co., Inc. Because he knew him as a customer, Bachelder approached Reilly about building the pond, the first time in 2008. When Bachelder did not hear back, he called Reilly again in 2009.

Reilly sent workers out to survey the area and reported back to Bachelder that it looked like they could build a pond for him. Then Bachelder, Reilly, and

---

[1] The title holder of the property was Bachelder, Inc.; that entity is the defendant-appellant in this action.

Reilly's employee, Charles Sender, met at the site. Sender had "staked out" the location where the pond would be. Bachelder recalled Sender telling him the maximum depth of the pond would be twenty to twenty-one feet. Reilly saw the location was a natural waterway with a small stream running through it, about three to four hundred feet across, fairly sloping to the bottom. Reilly agreed to build a dam across the valley to capture the water.

Reilly started construction of the pond in fall 2009 and finished in spring 2010. His construction company did not have any licensed engineers on staff and did not consult any before beginning the project. Reilly testified the first step in his process was to dig a core trench where the center of the dike would be located. Reilly explained: "You dig down, depending on soil conditions, but until you find a clay material." He said, in this case, they ran into a little bit of top soil, and then "were into clay material" and "dug approximately ten feet, and through the ravine or waterway, through the bottom, up into the slope," and then "started to fill that with on-site material that was available on the property." During the construction, Reilly's crew dug up two natural springs on the property, ostensibly to make them flow better and keep the pond filled. Reilly understood the Bachelders wanted the top of the dam to be wide enough to drive across. When finished the following spring, the dike was about twenty-five feet high, transected by a twenty-four-inch drainage pipe to allow the water to reach of a maximum depth of twenty-one feet.

Reilly billed Bachelder for his work, and Bachelder wrote Reilly checks in the amounts of $57,110.63 in December 2009 and $30,000 in April 2010.[2] The pond held water during the summer of 2010—when the precipitation was well above average. But that autumn the water level dropped dramatically. So dramatically, the Bachelders could see the tires Reilly's crew placed at the bottom of the pond to serve as a habitat for fish. Bachelder called Reilly to tell him the pond was not holding water.

Reilly went out to investigate and agreed to pump out the remaining water—free of charge—to look at the bottom of the pond for signs of leakage. Reilly sent Bachelder an email on October 12, 2010, detailing the next steps:

> The guys are going to pump out the pond and see what we can find in the coming days. Also when our guys were out there your wife did not care to [sic] much for the tires as fish habitat so we will remove those. So we are on the same page we will not charge you anything to pump out the pond and come up with a plan but if the solution is to find clay material and line the bottom then we would need to come up with some kind of compensation for that work. Pretty much all the good material from the west was used up for the dam and the clay on the east side was not plentiful so we may need to look at off site material.

Reilly also brought in an engineer at this point to "do some bore testing" to determine if the structure his company built was leaking. The dam appeared to be intact and the bottom of the pond was the same clay material Reilly discovered when he dug the core trench for the dam. But when he started exploring further up the slopes of the pond, he found "basically a plus or minus five foot shale layer that was not exposed to the environment but back in under

---

[2] The Bachelders also wrote Reilly a check for $29,851.50 in March 2011.

top soil." The shale layer was porous and water ran through it like it was sand. To stem the infiltration, Reilly came up with a plan to dig a trench along the sides of the pond, remove the shale, and replace it with clay from the bottom of the pond.[3] Reilly's crew started the remedial work in the fall of 2010, but "got froze out" and did not complete its digging until May 2011.

Reilly sent Bachelder a bill for the second round of work on the pond, which Bachelder declined to pay. On July 1, 2011, Reilly filed a mechanic's lien on the property, alleging Bachelder owed him $93,600 for work performed from November 2010 through May 2011. Reilly filed a petition to foreclose the mechanic's lien on August 9, 2011. Bachelder filed an answer and counterclaim on September 12, 2011. The counterclaim alleged Reilly was negligent in the construction of the pond, failed to comply with the oral contract, and failed to perform in a workmanlike fashion, causing Bachelder damages.

The district court held a trial without a jury on February 26 and 27, 2014. Both Reilly and Bachelder testified. Bachelder alleged he incurred numerous expenses related to the pond beyond the cost of construction, including a pump to move water from the spring to the pond, grass seed, and a windmill for aeration. Bachelder also estimated the cost of restoring the pond site to its pre-contract position would be $98,000.

According to the district court, the evidence indicated:

Since this suit was filed, the water level in the pond has varied greatly, depending upon the amount of rainfall. Following rainy

---

[3] Reilly also tried to draw more water into the pond by using a "french drain" fashioned out of PVC pipe to build up pressure at the two natural springs located on the site. Reilly acknowledged at trial the french-drain method did not work at all.

periods, the pond reaches levels that are aesthetically pleasing. When dry periods occur, the pond nearly dries up. The pond has been useless for recreational purposes for extended time periods. The springs do not significantly assist the pond in maintaining a useable water level. No outside water source has been added.

In addition, both sides presented expert testimony concerning the problems with the soil at the pond site. Bachelder called engineer Timothy Wiles as a witness. His study concluded "underlying soils in the pond are permeable and ineffective in holding water." Wiles testified the site was not suitable for a pond.

Reilly offered the opinion of engineer David Morrill. Morrill determined the work performed by Reilly on the embankment "conforms to typical construction standards." Morrill also opined "the lack of plans and an initial site exploration of the ponding area increases the risk of undesirable outcomes and is not typical for a structure of this size." Morrill testified most of the time geotechnical engineering is outside the regular pond design services; "eventually it's the owner that pays it. It can be arranged through the design consultant, but generally it's a separate operation in the design of the structures and the earth work." Like engineer Wiles, Morrill found the subsurface soil conditions in the area were "unfavorable for ponding" because the soil types and presence of limestone at a shallow depth would lead to "a high seepage loss of water" and a "fluctuating water level." In Morrill's opinion, the pond "will not maintain a permanent pool of water without the addition of a supplemental water source."

In its ruling, the district court discussed the relative roles of the parties and determined they were "both sufficiently sophisticated in business and technical

matters to recognize that professional planning and design services are available in connection with the construction of a recreational pond." The court noted the parties "chose to go ahead with this project without engaging those additional services." The court further concluded the parties "agreed upon the location, design, and essential features of the proposed pond before construction began."

The court declined to foreclose Reilly's mechanic's lien, reasoning: "After the work was completed and paid for, the pond failed to hold water and the plaintiff made repairs. The court concludes that this work was voluntarily done as part of the original compensation, without any agreement for further payment."

The court also rejected Bachelder's counterclaim for damages, explaining: "the oral contract included no express or implied warranties or guarantees." According to the court, Reilly alerted Bachelder to the "potential problem of the lack of a sufficient water supply and the possible need for a supplemental water source, when Reilly took Bachelder to his father's home and explained the operation of that pond." The court decided Bachelder "assumed the risk of this potential problem by going ahead with the design of the project without further professional assistance." The court ruled "the failure of the pond to perform as desired [was] not the result of a breach of contract" by Reilly.

Bachelder appeals, and Reilly cross-appeals.

## II.  Scope and Standards of Review

Both parties contend our review of the contract terms is for errors at law. But actions to enforce mechanic's liens are in equity. *See Flynn Builders, L.C. v. Lande*, 814 N.W.2d 542, 545 (Iowa 2012). Accordingly, our review is de novo.

*Id.* In our de novo review, we give the district court's fact findings weight, but we are not bound by them. *Id.* Our supreme court has noted mechanic's lien cases often involve "numerous charges and counter charges which depend entirely on the credibility of the parties," and appellate courts must recognize the trial court is "in a more advantageous position than we to put credence where it belongs." *Id.*

## III.  Contract Analysis

The existence of an oral contract for Reilly to build a pond on Bachelder's property is not in dispute.  The clashing point is whether their contract included an express or implied warranty the pond would hold water.

### A.  Express Warranty

We first consider Bachelder's contention that Reilly expressly warranted the pond would hold water, in fact as much as twenty feet of water, given the location of the stakes and the placement of the overflow pipe in the dam.  In reply, Reilly contends the theory of express warranty may not serve as the basis of recovery under Iowa law in a construction contract.  Reilly further argues even assuming the theory was available, substantial evidence supported the district court's conclusion Reilly made no express warranty concerning the pond.  We disagree with Reilly on both points.

The Iowa Supreme Court has recognized an express warranty may form the basis for recovery in a construction contract, even an oral construction contract.  *See Busker v. Sokolowski*, 203 N.W.2d 301, 303 (Iowa 1972).  Further, an express warranty can be created without using the words "warranty" or "guaranty."  *Flom v. Stahly*, 569 N.W.2d 135, 140 (Iowa 1997).  The party

alleging an express warranty must show the promisor "made some distinct assertion of quality" that would be relied on by the promisee, as opposed to a mere statement of opinion. *Id.* As in contracts for the sale of goods, an express warranty is created by "[a]ny affirmation of fact or promise *made by the seller to the buyer* which relates to the goods and *becomes part of the basis of the bargain.*" *See Moore v. Vanderloo*, 386 N.W.2d 108, 112 (Iowa 1986) (applying by analogy Iowa Code section 554.2313 (2013) to the sale of services). For instance, the promise to build a "first-class house" was an express warranty to engage in quality construction. *Busker*, 203 N.W.2d at 303; *see also Nationwide Agribusiness Ins. Co. v. SMA Elevator Const. Inc.*, 816 F. Supp. 2d 631, 680 (N.D. Iowa 2011) (accepting plaintiff's position that phrase, "state of the art," in the context of construction projects was not too nebulous to support an express warranty claim).

Reilly does not quibble with Bachelder's testimony that Reilly told him he could "do a pond" at the staked location on Bachelder's property. In his testimony, Reilly agreed he intended the pond would hold at least enough water so that the tires placed on the bottom for fish habitat would be covered up. By definition, a pond is "a body of water."[4] *See* American Heritage College Dictionary 1062 (3d ed. 1993); *see also* Iowa Code §§ 455B.171(39) (defining "water of the state" as including ponds), 462A.2(15) (defining farm pond as "a body of water"). When Reilly agreed to construct a pond on Bachelder's property, he was expressly warranting the pond would hold water. Otherwise,

---

[4] Without objection, Bachelder offered an exhibit at trial with this definition of pond: "a body of water, naturally or artificially confined, and usually less extent than a lake."

Reilly would have simply been constructing a dam, without any anticipation it would capture water to form a pond.

Reilly's promise to build a pond—that is a body of water—was supported by the record. Reilly acknowledged at trial he discussed building the pond with Bachelder, who said: "Let's get it done, but I don't want an empty pond like the one on the Middle Clamar Road that has never had water in it." Bachelder reasonably understood Reilly's agreement to move forward with the pond project as incorporating an affirmation that the finished product would indeed hold water. Where a warranty is made, "what the promisee is being led to expect on the part of the promisor is indemnification against loss in case the facts turn out not as represented." *See* Joseph M. Perillo, *Corbin on Contracts* § 1.14 at 38 (rev. ed. 1993). The fact that the designated location on Bachelder's land was not a suitable place for a pond constituted a breach of Reilly's warranty that he could build a pond at that site.

The district court focused on Reilly having "alerted" Bachelder to the "possible need for a supplemental water source" by taking Bachelder to see the pond Reilly built for his own father. This focus was misplaced. The key question was not the source of the water for the pond, but the structure's ability to retain water. Reilly acknowledged in October 2010 that the pond was leaking. We respectfully conclude the district court erred in finding no express warranty in the oral contract between Reilly and Bachelder. But even if the district court was correct in finding no express warranty in the oral contract at issue, we are persuaded by Bachelder's arguments concerning implied warranties.

### B. Implied Warranties

As our supreme court recently reiterated, Iowa courts have embraced the judicial doctrine of implied warranties when reviewing agreements between a builder and a consumer:

> Iowa has long recognized in construction contracts an implied warranty that a building "'will be erected in a reasonably good and workmanlike manner'" and that it "'will be reasonably fit for the intended purpose.'" *See Busker v. Sokolowski*, 203 N.W.2d 301, 303 (Iowa 1972) (quoting *Markman v. Hoefer*, 252 Iowa 118, 123, 106 N.W.2d 59, 62 (1960) (discussing the implied warranty found in construction contracts)); *see also Smith & Nelson v. Bristol*, 33 Iowa 24, 25 (1871) (stating the rule that in a construction contract that did not express a specific manner in which work was to be done, the work "was to be done in a workmanlike manner").

*Rosauer Corp. v. Sapp Dev.*, 856 N.W.2d 906, 908 (Iowa 2014).

In seeking to foreclose the mechanic's lien under Iowa code chapter 572, Reilly acknowledged entering a contract to construct a pond for Bachelder. In his cross-claim, Bachelder alleges Reilly breached the implied duty to construct the pond with due care and the implied warranty that the finished product would be fit for its particular purpose, specifically for use as a recreational pond.

### 1. Workmanlike Construction

When a construction contract does not specify the manner in which the work is to be done, Iowa courts will imply the builder has agreed to perform in a workmanlike manner. *Markman*, 106 N.W.2d at 62 (considering building contract for warehouses and tunnels for storing and drying onions); *Smith*, 33 Iowa at 24.[5]

---

[5] Our supreme court has applied the doctrine of implied warranty of workmanlike construction to the sale of a home by the builder to the first owner, *Kirk v. Ridgway*, 373 N.W.2d 491, 496 (Iowa 1985), and to subsequent purchasers. *Speight v. Walters Dev. Co.,* 744 N.W.2d 108, 114 (Iowa 2008). But the court has declined to apply the doctrine

Our case law does not include a specific definition of workmanlike manner. *Pike v. Kennedy*, No. 06-0184, 2007 WL 601538, at *3 n.3 (Iowa Ct. App. Feb. 28, 2007). But an agreement to do work in "a good and workmanlike manner" has been interpreted to mean undertaking "to produce definite and certain results." *Ideal Heating Co. v. Kramer*, 102 N.W. 840, 840–41 (Iowa 1905).

The *Kramer* court explained that a plumber who contracted to install radiation for steam heating in a house undertook not simply to do a good job of pipefitting but to have the installed apparatus operate with reasonable success in warming the house:

> The stipulation means something more than a promise to do a job which shall look well—something more than a good example of pipe fitting. A gristmill which will not grind, a reaper that will not cut grain, a locomotive that will not move when the proper power is applied, can hardly be said to have been constructed in a good and workmanlike manner. Even so, a heating apparatus that will heat nothing but the owner's temper must be said not to fill that condition. If a professional ditcher undertakes to drain a swamp in a good and workmanlike manner, but by a miscalculation makes the outlet of his ditch higher than the surface of the swamp, it will not avail him to say that the trench was evenly dug, and the tile laid with perfect regularity. A good and workmanlike job is one that is done as a skilled workman should do it.

*Id.* These century old sentiments are apropos to Reilly's promise to build a pond for Bachelder. Reilly's lack of due care was not in the construction of the dam but in the approval of the site selected for the pond. Reilly testified he and Bachelder "mutually agreed upon" the site for the dam and pond. But Bachelder's own expert opined the subsurface conditions at the site were

to the sale of a lot with no dwelling to a housing developer *Rosauer Corp.*, 856 N.W.2d at 907, or to a foreclosing lender who acquired apartment buildings by deed in lieu of foreclosure. *Luana Sav. Bank v. Pro-Build Holdings, Inc.*, 856 N.W.2d 892, 902 (Iowa 2014).

"unfavorable for ponding"—specifically, "the undesirable condition is a high seepage loss of water due to the soil types and presence of limestone at a shallow depth." A skilled workman with Reilly's experience in digging ponds may not avoid the implied warranty of workmanlike construction by pointing to the soundness of the dam. Reilly's miscalculation in not checking the soil conditions before digging, and thereby being unable to achieve the result of a pond that would hold water, constituted a breach of the implied warranty of workmanlike construction.

## 2. Fitness for a Particular Purpose

Bachelder relies on *Semler v. Knowling*, 325 N.W.2d 395, 397 (Iowa 1982) for the proposition that when "a contractor agrees to build a structure to be used for a particular purpose, there is an implied agreement on his part that the structure when completed will be serviceable for the purpose intended." The contractor bears the risk of accomplishing that purpose, unless waived by the consumer. *Semler*, 325 N.W.2d at 397–98. A contractor has not substantially complied with the contract unless the work is sufficient for the purpose or accomplishes such a result. *Id.*

*Semler* identified three elements of recovery under the theory of implied warranty of fitness for a particular purpose: (1) the builder must have reason to know the consumer's particular purpose; (2) the builder must have reason to know the consumer is relying on his skill or judgment to furnish appropriate services; and (3) the consumer must, in fact, rely upon the builder's skill or judgment. *Id.* at 399. In *Semler*, the court found the elements satisfied because

the property owner relied on the sewer contractor to install a sewer line to hook up with the main line without cutting through a newly paved street. *Id.*

### a. Builder had reason to know consumer's particular purpose.

On the first element, Bachelder asserts Reilly knew he wanted a "recreational pond" to be used for fishing, boating, and swimming. Reilly counters Bachelder never communicated his "need" for the pond to be a certain depth for those activities and denied he was "commissioned to build the pond for this 'particular need.'"

The record shows Reilly knew the purpose for the pond. Reilly's crew placed tires on the pond floor to serve as fish habitat. The size of the pond and the Bachelders' desire to drive across the dam to their property on the other side placed Reilly on notice that the large pond would be used for recreational purposes.

### b. Builder had reason to know consumer was relying on his skill or judgment to furnish appropriate services.

On the second element, Bachelder contends Reilly had "every reason to know" that, as consumers, he and his wife were relying on the skill and expertise of the construction company's owner in constructing the pond. Bachelder faults the district court for setting up a false equivalency concerning the relative levels of sophistication between Reilly and Bachelder for the purposes of this case. While it is true Bachelder is a business owner, his business is selling vehicles. He has no background in construction or civil engineering.

By contrast, Reilly operates a construction company that engages in a multimillion-dollar business across ten states. Reilly testified to having built a

dozen farm ponds and three other recreational ponds in various sizes. He testified sometimes he works with the U.S. Department of Agriculture's Natural Resource and Conservation Services when constructing the ponds. In those instances, Reilly said: "An engineer has usually drawn a set of plans, and they have done their prior research . . . ." Reilly acknowledged on cross-examination he knew engineering companies and government agencies were available if he had questions about properly building the pond. He also knew county maps existed showing the soil types, and he was able to read those resources, but he did not do so before constructing Bachelder's pond.

In addition, Reilly did engage in soil testing when constructing the dam. The construction company obtained clay dirt from a seven-acre field on the west side of Bachelder's property to use in building the dam. That conduct revealed Reilly's knowledge of the importance of using clay soil in pond construction and suggested he breached an implied warranty in not checking to see if the soil was too porous to hold water at other points on the pond site. Reilly also called an engineer for assistance when he found out the pond was leaking. That reaction also signaled Reilly's recognition that technical assistance was critical to ensuring the pond would be fit for Bachelder's purposes. Because Reilly had reason to know Bachelder was relying on his expertise, it was not reasonable for Reilly to expect the consumer to have independently contacted engineering firms and soil specialists when they jointly selected the pond site and for Reilly to have moved ahead with the project without verifying that preparation had been done.

### c. Consumer actually relied upon builder's skill or judgment.

On the third element, Bachelder did, in fact, rely upon Reilly's skill and judgment in building the pond. Charles Sender, Reilly's employee, staked the location and dimensions of the pond. Bachelder testified Reilly did not ask him to provide soil samples or to hire an engineer. Bachelder further testified he believed because Reilly was in the construction business, Reilly would obtain any information he needed concerning the soil at the pond site.

Having satisfied all three elements, Bachelder is entitled to recover under a theory of implied warranty of fitness for a particular purpose.

### 3. Affirmative defenses

Finally, Bachelder challenges the district court's determination he "assumed the risk" of the pond's failure by going ahead with the project without seeking assistance from engineers or soil experts. Reilly defends the court's determination by arguing Bachelder waived any implied warranty by agreeing to go forward with pond project after being alerted to "the potential problem of a lack of a sufficient water supply." Reilly also endorses the court's conclusion that Bachelder "assumed the risk" of constructing the pond without further professional assistance.

On appeal, Bachelder contends the legal theories of waiver and assumption of the risk are not available to Reilly because they are affirmative defenses not included in his pleadings in the district court. Affirmative defenses normally must be specially pleaded. *See* Iowa R. Civ. P. 1.419. But Reilly asserts these matters were "tried by consent" and are properly before us on

appeal. We agree the district court permitted introduction of evidence touching on the issues of waiver and assumption of the risk, without objection by the parties, which amounted to consent to try those issues even though they were not included in the pleadings. *See Harper v. Cedar Rapids Television Co.*, 244 N.W.2d 782, 786–87 (Iowa 1976).

On the merits of these issues, we disagree with the district court. We are not convinced the evidence concerning the pond Reilly built for his father, and the fact Bachelder may have learned it was sometimes refilled from a well, means Bachelder assumed the risk his pond was being built at a location with unsuitable soil conditions for pooling water. When Bachelder informed Reilly the pond was not holding water in the fall of 2010, Reilly returned to the site to figure out the root of the problem. Reilly did not respond that Bachelder needed to resort to a supplemental water source to refill the leaking pond.

In our de novo review, we conclude Reilly conveyed to Bachelder an express warranty he could build a pond, which is commonly understood to be a body of water. Even if the warranty was not express, Bachelder has established the elements of his claim that the oral contract included implied warranties of workmanlike construction and fitness for a particular purpose. We reverse the district court's ruling and remand for further proceedings to determine the damages incurred by Bachelder.

## IV. Refusal to Foreclose Mechanic's Lien

In his cross-appeal, Reilly argues the district court was mistaken in concluding he undertook extra work on Bachelder's pond in the fall of 2010 and spring of 2011 voluntarily, without expectation of payment, as part of the original agreement. Reilly contends the new work was "unrelated to the construction of the dam that originally resulted in the pooling of the water into a pond." He asserts the remedial work was in a different area and of a different nature. Reilly argues he should be compensated for his additional services by foreclosing the mechanic's lien.

A mechanic's lien is a creature of statute; its availability is driven by the doctrines of restitution and prevention of unjust enrichment. *Carson v. Roediger*, 513 N.W.2d 713, 715 (Iowa 1994).

> Every person who furnishes material or labor for, or performs any labor upon, any building or land for improvement, alteration, or repair thereof . . ., by virtue of any contract with the owner, . . . shall have a lien upon such building or improvement, and land belonging to the owner on which the same is situated . . . to secure payment for the material or labor furnished or labor performed.

Iowa Code § 572.2(1). We liberally construe this provision to effectuate its purpose and to assist parties in obtaining justice. *Carson*, 513 N.W.2d at 715.

Reilly admits he and Bachelder did not have an express contract for the work he completed to fix the pond but contends an implied contract existed. *See Roger's Backhoe Serv., Inc. v. Nichols*, 681 N.W.2d 647, 652 (Iowa 2004) (listing elements of implied contract as (1) contractor performed services under circumstances giving recipient, reason to understand they were performed for

him and were not rendered gratuitously, but with expectation of compensation from recipient and (2) services were beneficial to recipient).

To address the first element of implied contract, Reilly asserts he carried out his services in the fall of 2010 and spring of 2011 under such circumstances as to give Bachelder reason to understand that Reilly expected to be compensated. Reilly asserts that "once it was determined that the leak was no fault of Reilly, Reilly notified Bachelder that he would have to pay for those additional services, which at the time was believed to be bringing in clay materials to the site." On the second element, Reilly argues his services were "beneficial to Bachelder in that after the services were performed, the pond did hold water."

We are not persuaded by Reilly's argument on either element. First, Reilly mischaracterizes the notification in his October 2010 email to Bachelder. Reilly did not tell Bachelder that he would have to pay for all additional services; the email said if the solution was bringing in clay material from off site, they would "need to come up with some kind of compensation for that work." Because Reilly did not bring in clay from elsewhere, the email did not address the expectation of compensation. Second, the record does not support Reilly's allegation his additional services benefited Bachelder. As the district court found, even after 2011, the pond did not consistently hold water and its depth varied dramatically depending upon the amount of rainfall. Bachelder testified that in the summer of 2013, even with above average rainfall, the water level in the pond would drop three to four inches every two to four days.

Because Reilly did not establish he performed additional labor at the pond site by virtue of a new contract with Bachelder, we conclude the district court was correct in declining to foreclose the mechanic's lien.

**REVERSED AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**